**SIEMENS CREDIT CORPORATION, Plaintiff,**

v.

**Allan E. NEWLANDS, individually and d.b.a. Matrix Marketing Strategists, Defendant.**

**No. C93–4225–FMS.**

United States District Court, N.D. California.

Oct. 17, 1994.

Jeffrey J. Wong, Peter C. Califano, Cooper, White & Cooper, San Francisco, CA, for Siemens Credit Corp.

Kenneth P. Barnum, Langley Lambert Barnum & Kreger, Los Altos, CA, for Allan E. Newlands dba Matrix Marketing Strategists and Allan E. Newlands, Palo Alto, CA, Pro Se.

## AMENDED * ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

FERN M. SMITH, District Judge.

### ISSUES

This motion requires the Court to decide the following questions: (1) is the Lease entered into by the parties a financing lease, so that the plaintiff's obligation was limited to financing defendant's equipment purchase, and so that defendant was obligated to look to the supplier of the equipment; (2) has defendant created a material issue of fact as to whether plaintiff represented to him that plaintiff and the supplier of the equipment were all "part of the same company" such that plaintiff acted fraudulently and in bad

---

* Nonsubstantive changes were made for publica-    tion with the consent of the parties.

faith; (3) is the Lease unconscionable and unenforceable; and (4) is plaintiff entitled to the full amount of damages it claimed under the Lease?

## BACKGROUND

Plaintiff Siemens Credit Corporation ("Siemens Credit") has filed this motion for summary judgment against defendant Allan E. Newlands, individually and doing business as Matrix Marketing Strategists ("Matrix"). Plaintiff seeks to recover lease payments on which defendant has defaulted. The lease was for equipment which Siemens Credit acquired, at defendant's request, from Siemens Information Systems, Inc. ("SISI"), the manufacturer and supplier of the equipment. Siemens Credit acquired the equipment so that it could lease it back to defendant.

## I. DEFENDANT'S NEGOTIATIONS AND TRANSACTION WITH THE EQUIPMENT SUPPLIER (SISI)

Defendant prints brochures and materials for mass marketing. In need of advanced printing technology and machinery to satisfy his customers' needs, defendant, prior to March 22, 1991, conducted several meetings and discussions with sales representatives of SISI, an equipment manufacturer and supplier not a party to this action.

Mr. Newlands discussed his company's specific needs with SISI's sales representatives, and he was assured by the representatives that the equipment which is the subject of this litigation would meet those needs. Newlands Decl. ¶¶ 2–3. Based on these assurances, he entered into an Equipment Purchase Agreement ("Purchase Agreement") and an Equipment Maintenance Agreement ("Maintenance Agreement") with SISI, on March 22, 1991, and an Equipment Purchase Contract Addendum with SISI, on March 29, 1991. *Id.* ¶¶ 4–5.

Financing arrangements were also discussed during the course of the meetings with SISI's sales representatives. Mr. Newlands told the sales representatives that it was important to him that he "purchase or lease, and finance, the equipment through the same company, in order to avoid a situation where payments would have to be made to a lender for equipment that was defective, and having the lender claim that that was not the lender's problem." *Id.* ¶ 10. Mr. Newlands, in other words, did not wish to be precluded from asserting defects in the equipment as a defense to making lease payments. *Id.* ¶ 9.

Mr. Newlands alleges that the sales representatives told him that the equipment could be leased, and that financing for the lease could be arranged through "our (Siemens) credit company." *Id.* ¶ 6. These individuals represented to him that the manufacturer and lender were all part of the same company, and that the problem he was concerned about would not occur. *Id.* ¶ 10. There are no allegations that any employee of Siemens Credit made any misrepresentations.

## II. DEFENDANT'S TRANSACTION WITH THE PLAINTIFF LESSOR (SIEMENS CREDIT)

Financing was ultimately arranged through plaintiff, Siemens Credit, a corporation organized and existing under the laws of the State of Delaware and qualified to transact business in the State of California. Joint Statement of Undisputed Facts, filed September 16, 1994, ¶ 1.

On May 13, 1991, plaintiff and defendant entered into a written Master Equipment Lease Agreement ("Master Agreement") and Leasing Schedule (subsequently modified by Contract Addendum Supplemental No. 1 dated October 15, 1991) (collectively "Schedule No. 1"). On June 26, 1992, the parties entered into a second Leasing Schedule ("Schedule No. 2") (The Master Agreement, Schedule No. 1 and Schedule No. 2 shall be collectively referred to as the "Lease"). On May 14, 1991, the parties also entered into a written Purchase Agreement Assignment (the "Assignment"), which assigned defendant's rights in the Purchase Agreement between defendant and SISI to plaintiff, so that plaintiff could purchase the equipment from SISI and lease it to defendant. Newlands Decl., Ex. D

Plaintiff purchased the equipment from SISI, pursuant to the Lease and the Assignment, and delivered the equipment to defen-

dant. Schedule No. 1 required defendant to make monthly payments of $4,978.00, starting on September 7, 1991. Plaintiff received only 10 payments from defendant pursuant to Schedule 1; defendant made no Schedule 1 payments after the June 7, 1992 payment. Schedule No. 2 required defendant to make monthly rental payments of $522.46 for 38 months, starting on July 7, 1992. Plaintiff received only 4 payments from defendant pursuant to Schedule 2; defendant made no Schedule 2 payments after the October 7, 1992 payment.

Under Paragraph 9(a) of the Master Agreement, the failure to make monthly rental payments constitutes default. Plaintiffs, therefore, repossessed the equipment from defendant in June of 1993, and released it to Neodata, Inc. on a six-month lease at $8,500 per month, starting on December 1, 1993.

Defendant claims that the equipment never worked properly and proved unsuitable and unable to perform the tasks which SISI's sales representatives had represented it would perform. The equipment was not capable of performing, due to both shortcomings in design, and defects in its workmanship. Newlands Decl. ¶ 11. Due to the equipment's shortcomings, he was unable to fulfill his production commitments, resulting in significant loss of income and an inability to make the payments under the Lease. *Id.* ¶ 12.

Under Paragraph 9(b) of the Master Agreement, plaintiffs are entitled to all past due Lease payments and all future Lease payments discounted at 6% per annum. The balance due for rental payments under the Lease is $206,154.86. Joint Statement ¶ 13. The Lease also provides that upon defendant's default, it is entitled to its attorneys' fees and prejudgment interest on the Lease balance. Plaintiff claims attorneys' fees in the amount of $17,209.08, and prejudgment interest in the amount of $22,382.72. Additionally, although the Lease does not require plaintiff to re-sell or re-lease the equipment, plaintiff originally proposed giving defendant a credit in the amount of $25,500.00 for payments received from Neodata. This brings the total damages claimed by plaintiffs to $220,246.66. *Id.* ¶¶ 13, 15–16.

## DISCUSSION

Defendant does not dispute that he ceased making payments under the Lease. Instead, defendant opposes plaintiff's motion for summary judgment on the grounds that (1) plaintiff "breached the Equipment Purchase Agreement," in that the equipment was not free from defects in workmanship and materials as warranted; (2) that plaintiff breached oral and express warranties of suitability and fitness; (3) that plaintiff acted in bad faith and fraudulently in representing to defendant that plaintiff and SISI (or its successor in interest, Siemens Nixdorf (hereinafter, "Nixdorf") were all "part of the same company" and defendant was falsely led to believe he was purchasing and leasing the equipment from the same company; and (4) that the Lease Agreement was unconscionable and unenforceable because it is adhesive in nature, purports to eliminate breach of express or implied warranties as defenses to the obligation to make lease payments, and was secured through unequal bargaining, misrepresentation or fraud.

Plaintiff, citing two Fifth Circuit cases and a Seventh Circuit case, argues that these are affirmative defenses and that Fed.R.Civ.P. Rule 8(c) requires an answering party to set forth affirmative defenses in its answer or consider them waived. While Rule 8(c) lists fraud as an affirmative defense, it is less clear whether defendant's other arguments are affirmative defenses, or whether they negate an element of plaintiff's prima facie case. *See In re Rawson Food Service, Inc.*, 846 F.2d 1343, 1349 (11th Cir.1988). The Court need not resolve this question, however, because the Court finds defendant's objections to plaintiffs motion for summary judgment without merit.

## I. STANDARD FOR SUMMARY JUDGMENT

█ In order to withstand a motion for summary judgment, the opposing party must set forth specific facts showing that there is a genuine issue of material fact in dispute. Fed.R.Civ.P. 56(e) (West 1994). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202

(1986). In the absence of such facts, "the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

In opposing summary judgment, plaintiff is not entitled to rely on the allegations of his complaint. *See* Fed.R.Civ.P. 56(e) (West 1994). Furthermore, "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda." *S.A. Empresa De Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kidde & Co.*, 690 F.2d 1235, 1238 (9th Cir.1982). Rule 56 provides that "[w]hen a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts [that would be admissible as evidence] showing that there is a genuine issue for trial. . . ." Fed. R.Civ.P. 56(e) (West 1994).

The court does not make credibility determinations with respect to evidence offered and is required to draw all inferences in a light most favorable to the non-moving party. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir.1987) (*citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). Summary judgment is, therefore, not appropriate "where contradictory inferences may reasonably be drawn from undisputed evidentiary facts. . . ." *Hollingsworth Solderless Terminal Co. v. Turley*, 622 F.2d 1324 (9th Cir.1980).

## II. PLAINTIFF PERFORMED THE LIMITED FUNCTION OF FINANCING DEFENDANT'S EQUIPMENT PURCHASE; THE LEASE WAS, THEREFORE, A FINANCE LEASE AND DEFENDANT MUST LOOK EXCLUSIVELY TO THE SUPPLIER, SIEMENS NIXDORF, FOR REPRESENTATIONS, COVENANTS AND WARRANTIES

Defendant argues that plaintiff "breached the Equipment Purchase Agreement," by supplying equipment that contained defects in workmanship and materials; that plaintiff breached oral and express warranties of suitability and fitness; and that the Lease Agreement is unconscionable and unenforceable because it purports to eliminate breach of express or implied warranties as defenses to the obligation to make lease payments. The Court rejects these arguments because the Lease was a "finance" lease. Plaintiff was, therefore, obligated to do no more than finance defendant's equipment lease, and defendant was obligated to look exclusively to the manufacturer for all representations, covenants and warranties.

Finance leases are defined in section 2A–103 of the Uniform Commercial Code. Official comment (g) to that section describes these types of transactions as follows:

> A finance lease is the product of a three party transaction. The supplier manufactures or supplies the goods pursuant to the lessee's specification, perhaps even pursuant to a purchase order, sales agreement, or lease agreement between the supplier and the lessee. After the prospective finance lease is negotiated, a purchase order, sales agreement, or lease agreement is entered into by the lessor (as buyer or prime lessee) or an existing order, agreement or lease is assigned by the lessee to the lessor, and the lessor and the lessee then enter into a lease or sublease of the goods. Due to the limited function usually performed by the lessor, the lessee looks almost exclusively to the supplier for representations, covenants and warranties. If a manufacturer's warranty carries through, the lessee may also look to that. Yet, this definition does not restrict the lessor's function solely to the supply of funds. If the lessor undertakes or performs other functions, express warranties, covenants and the common law will protect the lessee.

U.C.C. § 2A–103, Official Comment (g).

Florida law controls this transaction, and the Florida version of Article 2A differs slightly from the official version. Florida

statute section 680.1031(1)(g) provides in pertinent part:

> (g) 'Financed lease' means a lease in which:
>
> 1. The lessor does not select, manufacture, or supply the goods;
>
> 2. The lessor acquires the goods or the right to possession and use of the goods in connection with the lease; and
>
> 3. Either:
>
> a. The lessee receives a copy of the contract evidencing the lessor's purchase of the goods on or before signing the lease contract; ...

Fla.Stat. § 680.1031(1)(g) (1993).

■ The Lease meets Florida's requirements for a finance lease. Subparagraph 1 is satisfied as the Lease clearly indicates, and it is undisputed by defendant, that plaintiff did not select manufacturer or supply the equipment. Subparagraph 2 is satisfied as plaintiff only acquired the equipment in order to lease it to defendant. Exhibit E to Newlands Decl. (Master Agreement) ¶ 3. Finally, subparagraph 3(a) is satisfied, as defendant executed the Purchase Agreement Assignment, which defendant received and approved in connection with the execution of the Lease.

■ As comment (g) to U.C.C. section 2A–103 noted, if the lessor undertakes or performs functions other than financing, express warranties, covenants and the common law will protect the lessee. Here, however, Siemens Credit's only role in the transaction was to finance the acquisition of the equipment. Defendant has not provided any evidence that plaintiff made any express warranties with respect to the equipment. In fact, the Lease disclosed, in capital letters, that plaintiff disclaimed all express and implied warranties and that defendants would be required to rely solely on the warranties given by the vendor (SISI, and its successor in interest, Siemens Nixdorf, hereinafter, "Nixdorf"). Master Agreement ¶ 3. In addition, as a matter of law, there are no implied warranties given by a lessor in connection with a finance lease. U.C.C. § 2A–212.

Defendant argues that Siemens Credit and SISI (and subsequently Nixdorf) are affiliated companies; therefore, Siemens Credit's disclaimers of warranties are unenforceable. The fact that the prime lessor and the supplier may be affiliated companies does not eliminate the Lease's status as a finance lease, and does not make the prime lessor's disclaimer of warranties unenforceable. Official comment (g) to U.C.C. section 2A–103 plainly states, "this article creates no special rule where the lessor is an affiliate of the supplier; whether the transaction qualifies as a finance lease will be determined by the facts of each case." Here, the facts establish that the Lease was indeed a finance lease.

Defendant also argues that when he assigned his rights to plaintiff under the Assignment Agreement, he "arguably" had no right or ability to claim breach of implied or express warranty, or defective product or workmanship, against either plaintiff or the manufacturer. This is clearly inaccurate. Under the Assignment, plaintiff accepted only the obligation to purchase and pay for the equipment. Assignment ¶ 3. Plaintiff's rights to assert any rights against the manufacturer under any warranties, were, in fact, assigned to defendant as plaintiff's agent:

> For the Term, Lessor [Siemens Credit] hereby appoints Lessee [Newlands] as Lessor's agent, so long as no Default (as hereinafter defined) has occurred and is continuing, to assert at Lessee's expense (if any) and to the extent permitted by applicable law, any right Lessor may have against any vendor, manufacturer and/or service company to enforce any product warranties with respect to the Equipment, provided however, Lessee shall indemnify and defend Lessor from and against all claims, expenses, damages, losses and liabilities incurred or suffered by Lessor in connection with any such action taken.

*Id.*

Any issues concerning the performance or warranty of the equipment are matters that should have, therefore, been addressed by defendant to the manufacturer (SISI, or Siemens Nixdorf, as successor in interest to SISI).

## III. DEFENDANT HAS NOT CREATED A MATERIAL ISSUE OF FACT AS TO WHETHER PLAINTIFF REPRESENTED TO DEFENDANT THAT PLAINTIFF AND SISI (OR NIXDORF) WERE ALL "PART OF THE SAME COMPANY"

■ Defendant's argument that plaintiff acted fraudulently and in bad faith in representing to defendant that plaintiff and SISI (or its successor in interest, Siemens Nixdorf (hereinafter, "Nixdorf") were all "part of the same company" and that defendant was falsely led to believe he was purchasing and leasing the equipment from the same company also fails. There is simply no evidence that the plaintiff made any such representations. Defendant has not presented evidence creating a material issue of fact that *plaintiff* falsely led defendant to believe he was purchasing and leasing the equipment from the same company.

Defendant, in his declaration, states several times that "Siemens' sales representatives" were the individuals who represented that the purchase or lease, and the financing, would be arranged through the same company. Newlands Decl. ¶¶ 6, 10. Moreover, the Assignment Agreement clearly states at paragraph 6 that "Customer [Newlands] acknowledges that Vendor [Nixdorf] is not an agent of [Siemens Credit], that Vendor has no power of authority to bind [Siemens Credit], and that in any dispute Customer will look to Vendor and not [Siemens Credit] for refund of any advance or down payments paid to Vendor." Although this paragraph was in the same type face as the rest of the agreement, the Assignment is a simple one page contract with only six short paragraphs. In short, if any misrepresentations were made, they were made by the vendor, SISI, and not by plaintiff.

## IV. THE LEASE AGREEMENT WAS NOT UNCONSCIONABLE AND UNENFORCEABLE

The Court turns finally to defendant's argument that the Lease Agreement was unconscionable and unenforceable because it is adhesive in nature, and was secured through unequal bargaining, misrepresentation or fraud. The Court finds these arguments unpersuasive as well.

■ "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party." *A & M Produce v. FMC Corp.*, 135 Cal.App.3d 473, 486, 186 Cal.Rptr. 114 (1982) (quoting *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449 (D.C.Cir.1965)). Unconscionability has both a "procedural" and a "substantive" element. *Id.*

■ The procedural element focuses on oppression, which results from an inequality of bargaining power, and surprise, which involves the extent to which the supposedly agreed-upon terms of the bargain are hidden in a prolix form drafted by the party seeking to enforce the disputed terms.

Defendant concentrates on the surprise element in arguing that the Purchase and Lease Agreements were unconscionable. He cites *Dorman v. International Harvester Company*, 46 Cal.App.3d 11, 19, 120 Cal. Rptr. 516 (1975), for the proposition that in order to be valid, a disclaimer provision must use clear and distinct language and be prominently set forth in large bold print in such a position as to compel notice.

■ Defendant first argues that the warranty disclaimer language "situated between the fine print" on the back of the Purchase Agreement does not compel notice. While the Court fails to see how plaintiff, the lessor, can be held responsible for a disclaimer by the manufacturer appearing in a Purchase Agreement to which it was not a party (other than as assignee under the subsequent Assignment Agreement), the Court finds, nevertheless, that the disclaimer in the Purchase Agreement meets the *Dorman* test. The court in *Dorman*, citing California U.C.C. section 2316, noted that an exclusion of the implied warranty of merchantability "in case of a writing must be conspicuous," and that exclusion of the implied warranty of fitness for a particular purpose "must be by a writing and conspicuous." *Id.* at 17, 120 Cal.Rptr. 516. The code defines "conspicuous" as "so written that a reasonable person

against whom it is to operate ought to have noticed it." *Id.* "A printed heading in capital letters (as: NON–NEGOTIABLE BILL OF LADING) is conspicuous. Language in the body of a form is 'conspicuous' if it is in larger or other contrasting type or color." *Id.* at 18, 120 Cal.Rptr. 516.

The disclaimer in the Purchase Agreement appears at paragraph 6. It is both bold faced and set off in a contrasting type. As the only section in the agreement, other than paragraph headings, set off in large type, it plainly meets the California U.C.C. definition of "conspicuous."

■ Defendant also challenges the conspicuousness of the disclaimer provision in the Lease. The disclaimer in the Lease appears at paragraph 3 of the Master Lease Agreement. Although the type-face is not as large as that in the Purchase Agreement, it is both bold faced and set off in a contrasting type. Also, as it is one of the first three paragraphs in the document, it too meets the requirements of the California U.C.C. test.

Defendant makes another procedural unconscionability argument when he alleges that the Lease is a contract of adhesion. While defendant correctly notes that the Court may refuse to enforce an unconscionable term in a pre-printed contract, there are no unconscionable terms in the Lease Agreement to refuse to enforce.

■ Even if a contract term fails the test of procedural unconscionability, an "unbargained for" term will only be denied enforcement if it is also substantively unreasonable. *A & M Produce,* 135 Cal.App.3d at 487, 186 Cal.Rptr. 114. A (substantively) unconscionable bargain has been defined as one that "no man in his senses and not under delusion would make on the one hand, and no honest and fair man would accept on the other." *Hume v. United States,* 132 U.S. 406, 10 S.Ct. 134, 33 L.Ed. 393 (1889). This standard has not changed in the intervening 100 years. *See e.g. Garrett v. Janiewski,* 480 So.2d 1324, 1326 (1985) (unconscionable synonymous with "shocking to the conscience" and "monstrously harsh").

■ Here, it cannot be said that the terms of the Lease were "shocking to the conscience." The risks of the bargain were allocated in an objectively reasonable way. Defendant was obligated to make payments on the Lease, and to seek any relief for breach of warranties, covenants, or representations from the manufacturer. Plaintiff, for its part, was left with the usual risks of a lender, for example, the risk that the defendant might default and plaintiff's loan might be subordinated in a bankruptcy proceeding, or the risk that the interest rate would rise.

■ Further, while a contractual term may be substantively suspect if it reallocates the risks of the bargain in an objectively unreasonable or unexpected manner, not all unreasonable risk allocations are unconscionable. Rather, "enforceability of the clause is tied to the procedural aspects of unconscionability such that the greater the unfair surprise or inequality of bargaining power, the less unreasonable the risk reallocation which will be tolerated." *A & M Produce,* 135 Cal.App.3d at 487, 186 Cal.Rptr. 114. As noted earlier, the agreements were not procedurally unconscionable, but even if they were, the level of procedural inequity here would be so low as to require an extremely unreasonable reallocation of risk.

■ Finally, as to defendant's claim that the Lease Agreement was unconscionable and unenforceable because it was secured through unequal bargaining, misrepresentation or fraud, defendant presents no evidence, other than his claims that the warranty release in the Lease was inconspicuous and that the Lease was a contract of adhesion, that plaintiff misrepresented anything about the financing arrangement defendant requested. Summary judgment is, therefore, GRANTED, as to the issue of the enforceability of the contract.

## V. PLAINTIFF IS ENTITLED TO THE FULL AMOUNT DUE ON THE LEASE

Defendant makes one final argument, that if this Court were to grant plaintiff's request for damages, these damages would amount to a "double recovery" in violation of U.C.C. §§ 2–602 and 2–718. This argument has no basis in law.

U.C.C. § 2–602 deals with a "constructive rejection" of goods. Defendant, however, has presented no evidence that he specifically rejected the equipment. U.C.C. section 2A–509, which deals with a lessee's rights on improper delivery, states that "[r]ejection of goods is ineffective unless it is within a reasonable time after tender or delivery of the goods and the lessee seasonably notifies the lessor." Defendant relies on *Garetto v. Almaden Vineyards,* 118 Cal. App.2d 99, 257 P.2d 477 (1953), for the proposition that a delay in rejection as a result of negotiation with the seller in an attempt to reconcile the breach of warranty excuses the delay. *Garetto,* however, is inapposite because the case involved a sale of goods, not a lease. Moreover, the delay in *Garetto,* about two weeks, can hardly be compared to the almost ten month delay here. Finally, the Court fails to see how defendant can claim constructive rejection after he made fourteen payments on the Lease.

Defendant argues that he is entitled to an "offset" for the equipment that he has recently surrendered to the plaintiff. But, as defendants correctly note, this request misses the essential fact that plaintiff was and currently is the owner of the equipment. Because plaintiff has at all times owned the equipment it cannot be required to credit defendant for the value of its own property. This is especially true here, where the Lease did not require plaintiff to dispose of the equipment or otherwise mitigate its damages.[1]

### CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is GRANTED in its entirety. Defendant and Siemens Nixdorf, are hereby ORDERED to contact the Court's ADR administrators to arrange for an Early Neutral Evaluation ("ENE") of defendant's third-party claim against Siemens Nixdorf and Siemens Nixdorf's cross-claim against defendant, within 90 days. If the third-party claim and cross-claim are not re-

solved after 90 days, defendant and Siemens Nixdorf shall return to this Court on February 3, 1995.

SO ORDERED.

---

1. Plaintiff did, in fact, mitigate its damages by releasing the equipment to Neodata for six months at $8,500 per month. At oral argument, plaintiff generously offered to credit defendant for the full $51,000 received from Neodata, reducing defendant's obligation under the Lease to $194,746.66.